UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

DOUGLAS W. DODSON,          )
        Plaintiff,         )
                            )
    vs.                   )        1:05-cv-1236-SEB-JPG
                            )
STAPLES, INC.,               )
        Defendant.     )

## ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR STAY OF PROCEEDINGS

This case comes before the Court on the Motion for Summary Judgment [Docket No. 36] filed by Defendant Staples, Inc. ("Staples"), pursuant to Fed. R. Civ. P. 56. Plaintiff, Douglas W. Dodson ("Mr. Dodson"), brings this suit against Defendant, his former employer, alleging that it violated the Americans with Disabilities Act and the Family and Medical Leave Act when it terminated his employment in May 2004.  For the reasons detailed in this entry, we hereby GRANT Defendant's Motion for Summary Judgment as to both claims.  In addition, we DENY as moot Defendant's Motion for Stay of Proceedings Pending Resolution of Defendant's Motion for Summary Judgment [Docket No. 63].

<u>Factual Background</u>

Staples is a major office supply retailer based in Framingham, Massachusetts, with locations throughout Indianapolis.  Prior to the termination of his employment, Mr. Dodson was employed by Staples as the General Manager of its Southport Road location.

Mr. Dodson had been a General Manager for Staples since August 1999 and had held that position at the Southport Road store since April 2002.  Throughout his employment, Mr. Dodson reported to District Manager Rodney Westerhouse ("Mr. Westerhouse"). Compl.¶¶ 20-21; Def.'s Br. at 2.

As General Manager, Mr. Dodson was responsible for the entire operation of the store to which he was assigned.  He was responsible for overseeing all personnel within the store as well as executing Staples's policies and procedures, including its loss prevention policies.  Def.'s Br. at 2.  During the years that he served as General Manager, Mr. Dodson apparently performed his job reasonably well, receiving increasingly favorable performance reviews and salary increases.  Id. at 3; Def.'s Exs. 9, 10, 13-15. Prior to the incident which (arguably) led to the termination of his employment, he was never disciplined for any violation of company policy.  Resp. at 2.

During the course of his employment with Staples, Mr. Dodson suffered from depression, acute stress disorder, and acute anxiety disorder.  Id. at 3.  In January 2001, Mr. Dodson discussed with Mr. Westerhouse the possibility of taking some time off due to depression and suicidal thoughts.  Mr. Westerhouse requested that Mr. Dodson "keep him posted" as to his needs, and reminded him of Staples's Employee Assistance Program.  Mr. Dodson did not end up taking any leave at that time for mental health reasons nor did he require any accommodation.  Compl.¶ 22; Def.'s Br. at 2-3.

In early March of 2004, Mr. Dodson's store conducted an assessment of its inventory.  During the course of the assessment, it was determined that two copies of

Adobe Photoshop 7.0 software were missing from inventory.  The total cost to Staples of the two copies of the software was $1,157.34, and a loss in this amount was reflected in the inventory reports.  Dodson Dep. at 90-91.  However, the items were on final clearance and their retail prices had been marked down significantly, such that they could be sold for approximately $4.50 each.  Dodson Dep. at 96; Westerhouse Dep. at 150.  Mr. Dodson and other Staples employees attempted to locate the missing products within the store but were unable to do so.

Mr. Westerhouse telephoned Mr. Dodson on March 8, 2004, to inquire about the inventory numbers.  Mr. Dodson informed him of the inventory "shrink"[1] of approximately $1,100, due to the missing software.  Mr. Westerhouse apparently told Mr. Dodson to "just take care of that."  Dodson Dep. at 150; Def.'s Br. at 4.  Mr. Dodson interpreted this to mean that he should do "whatever was necessary" to eliminate the discrepancy from the inventory report.  Resp. at 2.

Renee Walker ("Ms. Walker"), a Staples manager from another store who was assisting in the inventory process, also spoke with Mr. Westerhouse and then asked Mr. Dodson about the missing software.  Mr. Dodson told her, "Oh, that's sold."  Dodson Dep. at 135-36.

Mr. Dodson subsequently "purchased" the software himself.  Though there was no software to physically purchase, he paid approximately $9.00 out-of-pocket in order to

---

[1] "Shrink" is a retail industry term that refers to a discrepancy between actual on-hand inventory and what the records indicate should be physically present.  Dodson Dep. at 136.

3

eliminate the discrepancy from the inventory report.

Ms. Walker reported the suspicious sale to Mr. Westerhouse, who contacted Jon Garrett ("Mr. Garrett"), the area loss prevention manager, and asked him to conduct an investigation into the possible inventory discrepancy.  On March 9, 2004, Mr. Garrett asked Mr. Dodson about the software, and Mr. Dodson told him that the software had been found on the store's clearance rack and had been sold the previous day.  Dodson Dep. at 91-92.  When asked who had purchased the software, Mr. Dodson stated that a customer named Tim Fey – a friend of his – had.  Mr. Garrett then asked Mr. Dodson why the SKU number on the software had been entered manually for the sale instead of scanned automatically by bar code, as was typically done.  Mr. Dodson became anxious and told Mr. Garrett he would rather discuss the matter outside the store.  Mr. Dodson and Mr. Garrett left the store and went to lunch.  Id. at 92-94.

After lunch, in the Staples parking lot, Mr. Dodson indicated to Mr. Garrett that he had used poor judgment and made a mistake.  Id. at 94.  Mr. Garrett testified that Mr. Dodson told him that he and Mike Ratcliff, Assistant Manager at the store, had planned to split the cost of the two missing pieces of software in order to cover up the inventory shrink.[2]  Garrett Dep. at 21-22.

Mr. Dodson was visibly upset at this point and discussed his depression and

---

[2] As Mr. Dodson characterizes it, he and Mr. Ratcliff did have this conversation, but were not "hatching a scheme" in any serious or malicious way.  Rather, they had discussed, in a lighthearted manner, the incongruity in eliminating a $1,100.00 inventory problem for about $9.00.  Dodson Dep. at 96.

suicidal thoughts with Mr. Garrett.  He asked Mr. Garrett if he could phone a friend.  Mr. Garrett consented, and a friend of Mr. Dodson's arrived and took him to the emergency room at St. Francis Hospital, where he received treatment for depression.  Dodson Dep. at 97-98.  Effective the following day – March 10, 2004 – Mr. Dodson requested and received medical leave from Staples, pursuant to the Family and Medical Leave Act ("FMLA").  Pl.'s Ex. I.

Mr. Garrett continued his investigation by next interviewing Mr. Ratcliff, the Assistant Manager with whom Mr. Dodson had discussed "purchasing" the missing software.  Mr. Ratcliff admitted that the inventory shrink had not been accurately reported.  His employment was subsequently terminated on this basis.  Def.'s Br. at 6.

On March 12, 2004, while on leave, Mr. Dodson received a letter from Mr. Westerhouse, the District Manager, acknowledging that Mr. Dodson had had a discussion with Mr. Garrett about the missing software, and that they were unable to finish the conversation.  Pl.'s Ex. M.  The letter informed Mr. Dodson that, in order "[t]o bring this situation to a conclusion, it is critical that we receive a statement outlining the sequence of events in your own words.  It is imperative that we hear from you in person, by phone or in writing, by Friday, March 19, 2004."  Id.  Mr. Dodson did not respond to the letter.  He testified that his failure to respond was because, prior to his receipt of the letter, he had called Mr. Westerhouse to inform him that he had checked in to the hospital.  Mr. Dodson testified that Mr. Westerhouse told him in that conversation to disregard his prior letter.  Dodson Dep. at 118-19.  Mr. Garrett subsequently concluded his investigation

without further input from Mr. Dodson, concluding that Mr. Dodson had falsified the sale of the software.  Staples decided to wait until Mr. Dodson returned from leave before informing him of its decision to terminate his employment.  Def.'s Br. at 8.

On April 23, 2004, Mr. Dodson sent Mr. Westerhouse a letter informing him that he would be able to return to work "completely healthy" by May 9, 2004, after having spent approximately two months on leave.  Pl.'s Ex. G.  On about May 10, 2004, instead of having Mr. Dodson return to work at the store, Mr. Westerhouse set up a meeting with him at the district office.  At that meeting, Mr. Westerhouse informed Mr. Dodson that his employment was being terminated due to violation of company policy.  Def.'s Br. at 9; Resp. at 4.

Staples maintains several store policies relevant to the allegations against Mr. Dodson.  Its inventory management policy states that inventory management is "a key responsibility" of Staples managers, and requires General Managers to:

> honestly and accurately adhere to company policies and procedures regarding inventory control.  Inventory numbers must be accurately stated.  Manipulation of numbers to falsify or modify inventory information . . . will not be tolerated.  Activities designed to change inventory results are grounds for dismissal.

Def.'s Br. at 6.  In addition, Staples maintains an "integrity policy" which articulates expectations with regard to honesty and identifies "deceptive actions during physical inventory resulting in an inappropriate inflate effecting [sic] shrink" as a violation which may serve as grounds for immediate termination.  It also maintains an associate handbook which similarly classifies manipulation and falsification of inventory as serious

6

violations.  Id. at 6-7.

Mr. Dodson timely filed a Charge of Discrimination on the basis of his disability

with the Equal Employment Opportunity Commission ("EEOC") on November 10, 2004.

Pl.'s Ex. 1.  His EEOC claim was dismissed on May 26, 2005.  Pl.'s Ex. 2.  Mr. Dodson

then timely filed his complaint in this cause on August 18, 2005.  He alleges that

Staples's termination of his employment violated the Americans with Disabilities Act

("ADA") and the Family and Medical Leave Act ("FMLA") and resulted in substantial

loss of income and benefits, damage to his career, and mental and physical anguish.  He

seeks punitive and compensatory damages, injunctive relief (including reinstatement of

employment), and costs and fees.  Compl. at 6-8.  Staples filed its Motion for Summary

Judgment on June 29, 2006, upon which we now rule.

<u>Legal Analysis</u>

I.      *Summary Judgment Standard of Review*

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party

7

and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.

However, neither the "mere existence of some alleged factual dispute between the

parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the

material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of

Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears

the burden of proof at trial may discharge its burden by showing an absence of evidence

to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for

resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir.

1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the

non-movant, if genuine doubts remain and a reasonable fact-finder could find for the

party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises,

Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of

Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But, if it is clear that a plaintiff will be

unable to satisfy the legal requirements necessary to establish his or her case, summary

judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v.

AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove any single essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment.  Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

II.    *Plaintiff's ADA and FMLA Claims*

    A.    *Statutory Frameworks*

The ADA, 42 U.S.C. § 12101 *et seq.*, "protects 'qualified individuals with a disability' from discrimination in their employment, the hiring process, or promotions." Rooney v. Koch Air, LLC, 410 F.3d 376, 380 (7th Cir. 2005) (citing 42 U.S.C. § 12112(a)).  When a plaintiff, such as Mr. Dodson, seeks to prevail on a claim of discrimination without direct evidence of discriminatory motive or intent, we employ the McDonnell Douglas burden-shifting method of proof.  McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973).  Under McDonnell Douglas, the plaintiff must initially demonstrate a *prima facie* case of discrimination.  If one can be established, the burden shifts to the defendant to articulate a nondiscriminatory reason for the actions it took against the plaintiff.  If the defendant can offer a legitimate nondiscriminatory reason for the employment decision, the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual. Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005).

In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that (1) he or she is disabled within the meaning of the ADA, (2) he or she is qualified to perform the essential functions of his or her job either with or without reasonable accommodation, and (3) he or she suffered an adverse employment action due to his or her disability.  See Kupstas v. City of Greenwood, 398 F.3d 609, 611 (7th Cir. 2005); Dvorak v. Mostardi Platt Assocs., Inc., 289 F.3d 479, 483 (7th Cir. 2002). In order to establish the third prong, the plaintiff may seek to demonstrate that similarly situated employees received more favorable treatment (giving rise to an inference that the

10

cause of the adverse employment action was, indeed, the plaintiff's disability).[3]  <u>See</u>
<u>Leffel v. Valley Fin. Servs.</u>, 113 F.3d 787, 793 (7th Cir. 1997).

The FMLA is intended to "help working men and women balance the conflicting demands of work and personal life."  <u>Price v. City of Fort Wayne</u>, 117 F.3d 1022, 1024 (7th Cir. 1997).  It entitles eligible employees to take up to twelve work weeks of unpaid leave annually for several reasons, including the onset of a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 26 U.S.C. § 2612(a)(1)(D); <u>see also</u> <u>Nev. Dept. of Human Resources v. Hibbs</u>, 538 U.S. 721, 724 (2003).  "To ensure this entitlement, [the FMLA] makes it 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided,' . . . including the right to reinstatement upon return from leave[.]" <u>Kauffman v. Fed. Express Corp.</u>, 426 F.3d 880, 884 (7th Cir. 2005).

In order to establish a *prima facie* retaliation claim under the FMLA, a plaintiff must demonstrate that he or she engaged in an activity protected by the statute, that he or she subsequently suffered an adverse employment action, and that a causal connection existed between his or her exercise of FMLA rights and the adverse action.  <u>Horwitz v.</u>

---

[3] The Seventh Circuit recently offered some analysis of the varying formulations of the <u>McDonnell Douglas</u> test in <u>Timmons v. Gen. Motors Corp.</u>, ___ F.3d ___, 2006 WL 3512462 (7th Cir. Dec. 7, 2006).  The Court stated that, while the "similarly situated" language is frequently characterized as a fourth required element of the *prima facie* claim, this "is not the exclusive statement of the test."  <u>Id.</u> at *8.  Rather, what is more broadly required is a demonstration "that the circumstances surrounding the adverse action indicate that it is more likely than not that [a plaintiff's] disability was the reason for it."  <u>Id.</u>  This may be demonstrated by a showing that similarly situated but non-disabled employees were treated better than the plaintiff, or by other circumstantial evidence giving rise to such an inference.

<u>Bd. of Educ. of Avoca Sch. Dist. No. 37</u>, 260 F.3d 602, 616 (7th Cir. 2001).  As in the ADA context, if a plaintiff makes such a showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action; if the employer is successful, the burden shifts back to the plaintiff to submit evidence suggesting that the proffered reasons are pretextual.  <u>See King v. Preferred Technical Group</u>, 116 F.3d 887 (7th Cir. 1999) (applying the <u>McDonnell Douglas</u> framework to FMLA retaliation claim).

      *B.*     *Mr. Dodson's Prima Facie Claims*

      Mr. Dodson asserts that Staples retaliated against him for his use of leave under the FMLA by terminating his employment, and that the termination further constituted an adverse employment action taken against him because of his disability in violation of the ADA.  Compl. at 5-6.

      Staples does not contest that Mr. Dodson suffers from a disability, as the term is defined by the ADA.[4]  Similarly, there is no dispute that the termination of Mr. Dodson's

---

    [4] Under the ADA, a person is disabled if he or she (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such impairment.  42 U.S.C. § 12102(2).  We note that depression can qualify as a disability under the ADA.  <u>See, e.g.</u>, <u>Schneiker v. Fortis Ins. Co.</u>, 200 F.3d 1055, 1061 (7th Cir. 2000).  Further, it "may or may not give rise to a substantial limitation on a major life activity, depending on its severity."  <u>Cassimy v. Bd. of Educ. of Rockford Pub. Schls., Dist. #205</u>, 461 F.3d 932, 936 (7th Cir. 2006).  Because the non-movant does not dispute Mr. Dodson's characterization of his condition, we assume without deciding, for purposes of summary judgment, that he is disabled under the ADA.  Similarly, we assume for these purposes that his depression constitutes a "serious health condition" which brings him within the ambit of FMLA protection.

employment constituted an adverse employment action within the meaning of both statutes.  Staples does dispute that Mr. Dodson was qualified to perform the essential functions of his job – the second prong of a *prima facie* ADA claim.  It argues that Mr. Dodson was not satisfactorily performing his job, as evidenced by the events of March 8, 2004, herein discussed – the falsification of the software sale and his actions stemming from that incident.  However, we cannot properly consider these events in determining whether the second *prima facie* prong has been met.  As the Seventh Circuit stated in Goodwin v. Board of Trustees of University of Illinois (upon which Defendant relies at some length), "[t]his argument assumes its conclusion.  The entire purpose of the McDonnell Douglas test is to determine whether the action in question was a legitimate reason for [the adverse employment action].  [Plaintiff] had a satisfactory work record before [the date upon which the incidents occurred which gave rise to her termination], which is the relevant time frame here."  442 F.3d 611, 619 (7th Cir. 2006).  Here, as in Goodwin, Plaintiff has established this prong.  Mr. Dodson had never had disciplinary problems prior to this incident, and had in fact received increasingly favorable performance reviews.  Thus, he had proved himself qualified to perform the essential functions of his job.  Defendant's arguments are better framed as a proffer of legitimate, non-discriminatory reasoning for the termination of Plaintiff's employment; thus we will consider them in that light.

Having resolved all the other prongs of Plaintiff's prima facie claims under both the ADA and FMLA, the causal question presented by both statutes remains to be decided

here: was the adverse action taken against Plaintiff due to his disability (and/or the leave

he took as a result)?  Mr. Dodson attempts to demonstrate that it was, by introducing

evidence that similarly situated employees who also violated company policy were

treated differently.  He relies at great length upon the testimony of Michael Cunningham,

a former Staples manager.  Mr. Cunningham identified other individuals who violated

inventory management policies and were not terminated.  According to Mr. Cunningham,

one store manager, Kevin Vanderbeek, committed inventory violations in excess of

$6,000.  According to Mr. Cunningham, when he reported the violations to Mr.

Westerhouse, he was "furious" but did not terminate Mr. Vanderbeek.  Mr. Cunningham

also testified that Mike Stitzler, another manager, had an "unbelievable" number of

inventory management violations, which were also reported to Mr. Westerhouse, but Mr.

Stitzler was also not disciplined.  Resp. at 16.

Mr. Dodson and Mr. Cunningham also accuse Mr. Westerhouse himself, as

District Manager, of "regularly committ[ing] numerous violations of policy."  Id.  Mr.

Cunnningham testified that he considers Mr. Westerhouse to be dishonest and that he

regularly manipulated numbers in the course of his employment.  He described specific

instances in which Mr. Westerhouse allegedly encouraged Mr. Cunningham to falsify

records related to thousands of dollars of inventory.  Mr. Cunningham stated that he sent

the President of Staples a letter in 2000 informing him of Mr. Westerhouse's corruption,

but no disciplinary action was taken.  Id. at 16-17.

Staples responds that it applies its disciplinary policies uniformly and that

similarly situated individuals not in Mr. Dodson's protected classes who have committed violations have also been terminated.   Def.'s Br. at 7-8, 14-15.  It points primarily to Mr. Ratcliff, the assistant manager whose employment was terminated due to his involvement in, or knowledge of, Mr. Dodson's fraudulent software sale.  He had no known disabilities and had not taken any FMLA leave.  Staples also cites Lee Weber, a former store manager who falsified inventory reports in order to cover up the fact that certain items were missing.  His employment was also terminated based on that incident.  Mr. Weber also was not disabled and had not taken leave.  Staples points out that it was Mr. Dodson who issued Mr. Ratcliff a disciplinary warning for failing to timely report Mr. Weber's falsification, demonstrating that Dodson clearly understood the seriousness of Staples's inventory control policies.  Id. at 14.[5]

Staples also responds that Mr. Vanderbeek and Mr. Stitzler are not valid comparators because there is no evidence that Staples ever found these individuals to have violated inventory control policies.  In fact, Mr. Garrett, the loss prevention manager, testified that he never knew of anyone who had been found to have falsified inventory who was not terminated.  Reply at 5.  Further, Staples points out that Mr.

_____

[5] Plaintiff responds that Mr. Weber and Mr. Ratcliff are not "similarly situated" comparators.  Mr. Dodson contends that his situation is distinguishable because he had no prior disciplinary record, his disciplinary violation did not "harm" Staples (ostensibly because he did not actually remove physical inventory), and he was "order[ed]" by Mr. Westerhouse to commit his violation.  Mr. Dodson contends that Staples's proposed comparators are distinguishable, because Mr. Ratcliff had a previous disciplinary record, and Mr. Weber had perpetrated (without prodding from Mr. Westerhouse) a fraud that involved the actual removal of inventory from the store.  Resp. at 18.

Westerhouse, who has never been found to have violated policy, is himself disabled – he has an artificial leg and no use of one arm – and that the fact that he has never been terminated strengthens the evidence that Mr. Dodson's termination was unrelated to his disability.  Id. at 6.

We hold, for purposes of this summary judgment, that Mr. Dodson has established *prima facie* claims under the ADA and the FMLA.  Clearly, a material issue of fact exists as to whether similarly situated individuals were treated more favorably than was Mr. Dodson.[6] At the summary judgment stage, we do not weigh the evidence before the court. A jury could reasonably choose to believe the testimony of Mr. Cunningham or the testimony of Mr. Garrett.  So long as a reasonable fact-finder could find that similarly situated individuals were treated more favorably than the plaintiff, summary judgment is precluded as to this question.  The conflicting testimony here gives rise to such a situation.  Therefore, we proceed to the next step of the <u>McDonnell Douglas</u> analysis.

---

[6] Of the three comparators suggested by Mr. Dodson, this analysis applies to Mr. Vanderbeek and Mr. Stitzler only.  In order to demonstrate that an employee is similarly situated, a plaintiff "must show that there is someone who is directly comparable to [him or] her in all material respects."  <u>Patterson v. Avery Dennison Corp.</u>, 281 F.3d 676, 680 (7th Cir. 2002).  This includes whether the plaintiff and the comparator had comparable experience and job responsibilities and whether they reported to the same supervisor.  <u>See</u> <u>Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612, 617-18 (7th Cir. 2000).  Mr. Westerhouse was Mr. Dodson's supervisor, with an entirely different job description, and thus clearly cannot be considered a similarly situated employee.  Mr. Vanderbeek and Mr. Stitzler are more similar to Mr. Dodson – Mr. Vanderbeek was a general manager and Mr. Stitzler was a store sales manager – and both reported to Mr. Westerhouse.  Therefore, they are valid comparators for "similarly situated" analysis.

C.    *Staples's Proffer of a Nondiscriminatory Reason for Termination and Mr. Dodson's Pretext Argument*

Staples argues that it had a completely legitimate, non-discriminatory reason for the termination of Mr. Dodson's employment, to wit: Mr. Dodson falsified the sale of $1,100 worth of software and was subsequently dishonest about that falsification to both Ms. Walker and Mr. Garrett. Def.'s Br. at 11. Staples maintains policies which directly prohibit this conduct and has terminated other managers who have committed similar violations, including Mr. Weber and Mr. Ratcliff. Dishonesty and falsification of records qualify as legitimate, non-discriminatory reasons for the termination of employment. See Lucas v. Chicago Transit Auth., 367 F.3d 714 (7th Cir. 2004) (submission of false reports merited dismissal of employee); Peters v. Renaissance Hotel Operating Co., 307 F.3d 535 (7th Cir. 2002) (submission of false activity logs merited dismissal of employee). Thus, Staples argues, Mr. Dodson's claims under the ADA and FMLA cannot withstand summary judgment.

Mr. Dodson contends that Staples's justification is pretextual. First, Staples had cultivated a culture which "encouraged inventory manipulation, dishonesty, and fraud," in which the only way to achieve success was to manipulate inventory numbers. Resp. at 11. Mr. Dodson and Mr. Cunningham testified that inventory shrink was "very competitively gone after, even at the expense of following policy." Id.

Mr. Dodson also argues that his supervisor, Mr. Westerhouse, *told* him to falsify the inventory records when he told him to "take care of" the missing software. According

17

to Mr. Dodson, "[w]hen Mr. Westerhouse said 'take care of that,' he meant for the listener to violate company policy and do whatever was necessary to avoid shrink or less favorable inventory numbers." Id. at 2.  Mr. Cunningham corroborates this theory, stating that, in his personal experience, this is what Mr. Westerhouse would have meant by this statement.  Cunningham Dep. at 124-25.

Mr. Dodson further asserts that the fact that Staples did not uniformly enforce its policies, as evidenced by his claims that other employees committed inventory management violations but were not punished, suggests pretext, as does Staples's failure to follow normal policies in terminating his employment.  Staples did not obtain a final official statement from Mr. Dodson before concluding its investigation about the inventory incident.  Mr. Dodson notes the irregularity of Mr. Westerhouse sending him a letter while he was on leave requesting an official statement, followed by their discussions in which Mr. Westerhouse allegedly told Mr. Dodson to disregard the letter. Resp. at 19-20.  In addition, Mr. Dodson cites issues relating to the timing of the termination of his employment – specifically, documentation from Staples that indicates that the decision to terminate his employment occurred on March 16, 2004, but the date of termination was subsequently changed to May 11, 2004.  Id. at 20.  According to Mr. Dodson, these departures from normal policy suggest pretext.

Staples rejoins, arguing that it "defies common sense" for Mr. Dodson to have interpreted Mr. Westerhouse's statement to "take care of that" as an implied directive that he falsify the records.  Staples contends that "[a]ny reasonable employee, if told by a

18

supervisor to 'take care of' a problem, would normally assume that he or she should take care of the problem in accordance with the employer's rules, expectations and procedures. Mr. Dodson cannot excuse his dishonesty and misconduct by blaming it on such an alleged misinterpretation of his supervisor's direction." Def.'s Br. at 12.  Staples also characterizes Mr. Cunningham's opinions regarding the corporate culture at Staples as the "unsubstantiated allegations" of an ex-employee, and attempts to offset Cunningham's testimony with the contrary views of other managers.  See Reply at 2-3.  Finally, Staples argues that its proffered explanation is not pretextual because it had known about Mr. Dodson's depression disability for years and had granted him increasingly favorable performance reviews and salary increases during that time, until the incident that led to his dismissal.  Id. at 11.

We cannot conclude that Staples's proffered explanation of Mr. Dodson's dismissal is pretextual.  In order to demonstrate pretext, Mr. Dodson would need to show that Staples's proffered reasons were "factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge."  Peters v. Renaissance Hotel Operating Co., 307 F.3d 535, 548 (7th Cir. 2002) (quoting Gordon v. United Airlines, 246 F.3d 878, 889 (7th Cir. 2001)).  If an employer's explanation rings false, we may infer that the employer is attempting to cover up a discriminatory purpose. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 147 (2000).

Staples's explanation here, however, does not ring false.  It is undisputed that Mr. Dodson did falsify the sale of inventory and did subsequently lie about it to two other

19

Staples managers, including his direct supervisor, Mr. Westerhouse.  It is also undisputed that Staples maintains numerous written policies which unequivocally prohibit such activities.  Staples has terminated others for noncompliance with these same policies, including the assistant manager (Mr. Ratcliff) who was aware of, and failed to report, Mr. Dodson's conduct.  Given this rather straightforward series of facts, we cannot conclude that Staples's reasoning was factually baseless or a disingenuous justification for the unlawful termination of Mr. Dodson's employment.

It is not our charge to determine whether Staples's decision to dismiss Mr. Dodson was mistaken, ill-considered, or foolish; pretext has not been demonstrated so long as Staples honestly believed its reasons and honestly acted upon them.  See Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000); Cardoso v. Robert Bosch Corp., 427 F.3d 429, 436 (7th Cir. 2005).  We find that, given these undisputed facts and the arguable harshness of Staples's decision to terminate Mr. Dodson's employment, a reasonable fact-finder could not conclude that Mr. Dodson's dismissal was more likely motivated by discriminatory reasons.

Mr. Dodson points to other Staples employees who, according to him and Mr. Cunningham, offended Staples's policies in an (arguably) more egregious manner.  Even if this were the case, it would be insufficient to demonstrate that Mr. Dodson was disparately treated based on his disability or the taking of leave.  "A plaintiff cannot be permitted to manufacture a case merely by showing that the employer does not follow its employment rules with Prussian rigidity."  Walker v. Abbott Laboratories, 416 F.3d 641,

644 (7th Cir. 2005).  Moreover, it is not up to us to determine how Staples chooses to enforce its policies, so long as it does not apply them selectively based on discriminatory criteria.  <u>See</u> <u>Cardoso</u>, 427 F.3d at 435 ("As we have often stated . . . the court is not a 'super-personnel department' intervening whenever an employee feels he is being treated unjustly.").  We similarly cannot give credence to Mr. Dodson's contention that Mr. Westerhouse intended for him to violate store policy when he told him to "take care of" the problem, or that a "culture of dishonesty" pervaded the work environment.  <u>See</u> <u>Wells v. Unisource Worldwide, Inc.</u>, 289 F.3d 1001, 1007 (7th Cir. 2002) ("We have typically been wary of allegations based on nothing but an attempt to come up with a conspiracy theory[.]").

Therefore, because Mr. Dodson has not succeeded in establishing that issues of material fact exist which might demonstrate that Staples's proffered explanation is pretextual, we must GRANT summary judgment in Staples's favor as to both claims, and final judgment will be entered accordingly.  Staples's Motion for Stay of Proceedings is hereby DENIED as moot.  IT IS SO ORDERED.

Date: _____12/20/2006_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kevin W. Betz
BETZ & ASSOCIATES
kbetz@betzadvocates.com

21

Emery King Harlan
GONZALEZ SAGGIO HARLAN
emery_harlan@gshllp.com

Elizabeth Ann Mallov
BETZ & ASSOCIATES
emallov@betzadvocates.com

Miriam A. Rich
GONZALEZ SAGGIO & HARLAN, LLP
richm@gshllp.com

Alejandro Valle
GONZALEZ SAGGIO & HARLAN LLP
alejandro_valle@gshllp.com